UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------------------X

SANDRA LEUNG and HSIAO CHUN WU,                     Case No: 16-cv-4356

                              Plaintiffs,

          -against-                                 **VERIFIED COMPLAINT**

THE TOWN OF OYSTER BAY, FREDERICK P.                **Jury Trial Demanded**
IPPOLITO, individually, JOSEPH CIAMBRA, individually,
GARY BLANCHARD, individually, and JOSEPH CANGRO,
individually,

                              Defendants.

---------------------------------------------------------------------------X

    Plaintiffs SANDRA LEUNG and HSIAO CHUN WU, by their attorneys Campanelli &

Associates and the Law Offices of David A. Antwork, P.C., as and for their Verified Complaint

against Defendants, THE TOWN OF OYSTER BAY, FREDERICK P. IPPOLITO, individually,

JOSEPH CIAMBRA, individually, GARY BLANCHARD, individually, and JOSEPH CANGRO,

individually, respectfully show to this Court and allege the following upon information and belief:

## NATURE OF THE ACTION

1.      "There is something rotten in the town of Oyster Bay…"

        *-U.S. District Court Judge William D. Wexler speaking about Defendants*
        *Frederick P. Ippolito and the Town of Oyster Bay, as quoted in Newsday,*
        *July 13, 2016.*

2.      This is a civil action pursuant to 42 U.S.C. §§ 1983 and 1985(3) seeking

compensatory damages, punitive damages, costs and expert and attorney's fees, to redress

deprivations of the Plaintiffs' procedural and substantive due process rights.

1

3.      Under color of state law, and pursuant to a conspiracy to shut down Plaintiffs' restaurant tenant, the Plaintiffs, owners and landlords of a parcel of property located at Two Spring Street, Oyster Bay, New York (hereinafter referred to as the "Premises"), were denied their due process rights of notice and the right to be heard; and the means employed by the Defendants were arbitrary, unreasonable, oppressive, conscience shocking, and bore no reasonable relation to the ends sought to be accomplished.

4.      On or about September 16, 2013, both entrances to Plaintiffs' restaurant tenant, Cafe Al Dente ("Al Dente"), an Italian restaurant which had been in business for twenty years, were unlawfully padlocked by Defendants Frederick P. Ippolito, Joseph Ciambra, Gary Blanchard, and Joseph Cangro (hereinafter collectively referred to as the "Conspiring Defendants") and the gas and electricity were shut off, under color of state law.

5.      Both doors, which were Plaintiffs' only access to the basement, remained padlocked and the gas and electricity were shut off by the Conspiring Defendants for over **one and a half years**, spanning two winter seasons, and, despite Plaintiffs warnings and desperate pleas to Defendants to gain access to their property, proximately caused pipes to freeze and burst, which in turn caused significant damage to the Premises.

6.      The unlawful and conscience shocking actions of the Conspiring Defendants were precipitated and accompanied by falsehoods, and by arbitrary, confiscatory, and oppressive demands and actions, intended to shut down Plaintiffs' tenant causing Plaintiffs extreme economic loss and property damage and forced them to sell the Premises at a tremendous financial loss.

2

7.     Al Dente and its owner have already won a jury verdict against these very same defendants for fundamentally the same constitutionally offensive conduct in the United States District Court, Eastern District of New York, 14-cv-1241 (LDW)(GRB).

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1343 because the matters in controversy arise under the United States Constitution and laws of the United States.

9.     Venue in the Eastern District of New York is proper pursuant to 28 U.S.C. §1391(b) inasmuch as the events that gave rise to the Plaintiffs' claims took place within the Eastern District.

## PARTIES

10.     At all times relevant hereto, Plaintiff SANDRA LEUNG ("LEUNG") is an individual who was and is a resident and domiciliary of the State of New York, County of Queens, with a principal residence located at 4026 College Point Boulevard, Apt. 18E, Flushing, New York 11354.

11.     At all times relevant hereto, Plaintiff HSIAO CHUN WU is an individual who was and is a resident and domiciliary of the State of New York, County of Queens, with a principal residence located at 79-37 213th Street, Oakland Gardens, New York 11364.

12.     At all times relevant hereto, Defendant Frederick P. Ippolito ("IPPOLITO") was the Commissioner of the Department of Planning and Development for the Town of Oyster Bay with a principal place of business or employ located at 54 Audrey Avenue, Oyster Bay, NY 11771. IPPOLITO is being sued in his individual capacity.

13.     Upon information and belief, IPPOLITO resides in the State of New York, County of Nassau, with a principal place of residence located at 45 Pelican Court, Syosset, New York 11791.

14.     At all times relevant hereto, Defendant Gary Blanchard ("BLANCHARD") was a building inspector for the Town of Oyster Bay with a principal place of business or employ located at 54 Audrey Avenue, Oyster Bay, NY 11771.  BLANCHARD is being sued in his individual capacity.

15.     Upon information and belief, BLANCHARD resides in the State of New York, County of Nassau, with a principal place of residence located at 37 Barbara Street, Bethpage, New York 11714.

16.     At all times relevant hereto, Defendant Joseph Ciambra ("CIAMBRA") was a building inspector for the Town of Oyster Bay with a principal place of business or employ located at 54 Audrey Avenue, Oyster Bay, NY 11771.  CIAMBRA is being sued in his individual capacity.

17.     Upon information and belief, CIAMBRA resides in the State of New York, County of Nassau, with a principal place of residence located at 25 Troscher Lane, Bethpage, New York 11714.

4

18.     At all times relevant hereto, Defendant Joseph Cangro ("CANGRO") was a building inspector for the Town of Oyster Bay with a principal place of business or employ located at 54 Audrey Avenue, Oyster Bay, NY 11771.  CANGRO is being sued in his individual capacity.

19.     Upon information and belief, CANGRO resides in the State of New York, County of Nassau, with a principal place of residence located at 4 Dolores Place, Plainview, New York 11803.

20.     Upon information and belief, the Town of Oyster Bay ("TOWN") is a municipal corporation, duly incorporated under the laws of New York, with a principal place of business located at 54 Audrey Avenue, Oyster Bay, NY 11771.

## FACTUAL ALLEGATIONS

### A.     History of the Premises

21.     The Premises, constructed in 1925, is located on the southwest corner of Shore Avenue and Spring Street (Sec-27, Block-44, Lot-74) within the TOWN.  The Premises consists of two structures; a two-story brick building with a restaurant on the first floor and basement access and a two-bedroom apartment on the second floor as well as a three-bedroom house, both on the same tax lot.

22.     Rial Realty Corp. purchased the Premises in 1987.  On or about February 26, 1990, Rial Realty Corp. received Certificate of Occupancy No. A21188 for the "interior alterations of the restaurant, first floor only, 40' x 41.83' irregular."

23.     In or about 1990, Rial Realty Corp. received two "Certificates of Approval of Plumbing," numbers 06440 and 06530, from the TOWN's Department of Planning and Development for the Premises. The "Certificates of Approval of Plumbing" were for interior alterations on the first floor (restaurant) of the Premises. This was pursuant to Building Permit No. L14335, issued November 14, 1989; for which the Certificate of Occupancy No. A21188, was issued on February 26, 1990.

24.     Rial Realty Corp. received an electrical underwriter's Certificate of Electrical Approval, NBFU No. 113595, pursuant to Building Permit No. L14335, for the Premises.

25.     Building Permit No. L14335, was the predicate for the issuance of Certificate of Occupancy No. A21188, dated February 26, 1990, for the Premises.

26.     The TOWN "Approved the Plan" for the "Gazebo Restaurant" on November 14, 1989, under Building Permit No. L14335, for the Premises.

27.     The TOWN approved the amended plan for Building Permit No. L14335, on February 6, 1990, for the interior construction at the Premises.

28.     The amended plan, authorized a single handicap accessible bathroom for the first floor restaurant at the Premises.

29.     The Gazebo Restaurant conducted business under Certificate of Occupancy No. A21188, dated February 26, 1990.

6

30.     Upon information and belief, there are up to fourteen inspections necessary before a Certificate of Occupancy may be issued to a restaurant operation.  The inspections include, but are not limited to, approvals of electrical and plumbing installations.

31.     Certificates of Approval of the Plumbing, No. 6530 and No. 06440, were issued to Rial Realty Corp, pursuant to Building Permit L14335 for the Premises.

32.     In or about 1992, a restaurant named "Christine's" succeeded the Gazebo Restaurant at the Premises.

33.     On August 13, 1992, the TOWN approved a plan, pursuant to Building Permit No. L30017, for "the first floor" and "basement preparation room" for the restaurant.

34.     Building Permit No. L30017 was issued to Rial Realty Corp., to perform construction on Christine's Restaurant.

35.     The "Approved   Plan pursuant   to Building Permit   No. L30017, displayed the "Basement Preparation Room."

36.     A Certificate of Occupancy No. A27651, dated October 16, 1992, was issued to Rial Realty Corp., pursuant to Building Permit No. L30017.

37.     Certificate of Occupancy, No. A27651, was issued for the "interior alterations of Christine's", at the Premises.

38.     The "Plan", approved by the TOWN, on August 13, 1992, approved a single handicap accessible bathroom, and a basement preparation room.

7

39.     Upon information and belief, at all relevant times herein, since October 16, 1992, there have been no alterations to the interior of the first floor, or basement preparation room at the Premises.

40.     Al Dente succeeded Christine's and, upon information and belief, commenced business on or about April 1, 1994.

41.     Upon information and belief, approximately 75% of Al Dente's lunch crowd were TOWN employees, inasmuch as Al Dente's was located essentially across the street from TOWN hall.  Upon information and belief, TOWN employees commonly held office parties, birthday parties and other parties and group celebrations at Al Dente.

42.     Upon information and belief, the Conspiring Defendants were customers of Al Dente until 2012, when IPPOLITO forbade TOWN employees from patronizing Al Dente.

43.     Upon information and belief, for a period of nearly twenty years, Al Dente routinely passed inspections from the Nassau County Fire Marshall's Office and the Nassau County Department of Health.

**B.     Plaintiffs Purchase the Premises**

44.     In or about 2004, the Plaintiffs, who were seeking a prudent and fruitful investment opportunity, purchased the Premises for $700,000.  Both Plaintiffs purchased the Premises individually, as tenants in common.

45.     The Premises were particularly attractive to the Plaintiffs inasmuch as it was a corner property, there was already a well-known, successful restaurant tenant in place for the previous ten years and all of the necessary permits and certificates of occupancy for the restaurant were already in place as being duly issued by the TOWN.

46.     Over the course of the time the Plaintiffs owned the Premises, approximately eleven years, they invested at least one hundred thousand dollars ($100,000.00) to make improvements to the Premises.

**C.     The Defendants Conspire to Unlawfully Shut Down Plaintiffs' Tenant Which Unlawfully Interfered with Plaintiffs' Property Rights as Owners of the Premises**

47.     Upon information and belief, on January 1, 2009, after an absence of twenty-one years, IPPOLITO returned to his former position as the Commissioner of the Department of Planning and Development for the TOWN.

48.     Upon information and belief, one of IPPOLITO's commercial and business interests during his twenty-one-year respite was ownership of an Italian restaurant.

49.     Upon information and belief, on May 24, 2012, Al Dente's owner, Philip M. Morizio ("Mr. Morizio") was called to IPPOLITO's office whereupon IPPOLITO told Mr. Morizio that Al Dente was finished doing business in Oyster Bay and should relocate to another site.

50.     Upon information and belief, the next day, May 25, 2012, TOWN building inspector, James Baudille, visited Al Dente and informed Mr. Morizio that IPPOLITO had directed him to "write up" Al Dente for everything he could, however none of the trumped-up violations alleged a violation of Article 96, "Dangerous Buildings," of the TOWN code, nor were there any charges alleging any type of dangerous building or structure.

51.     Inasmuch as the Plaintiffs were the owner of the Premises, they were likewise hit by the TOWN with these trumped-up and bogus violations.

52.     On or about June 3, 2013, all of the trumped-up and bogus violations issued by the TOWN against the Plaintiffs and Al Dente were dismissed.

53.     Upon information and belief, in 2013, Mr. Morizio was informed that IPPOLITO had forbade TOWN employees from patronizing Al Dente.

54.     Furthermore, upon information and belief, in April of 2013, Mr. Morizio was once again summoned to IPPOLITO's office wherein IPPOLITO informed Mr. Morizio that he wanted the restaurant to construct a "permanent enclosure" in its courtyard.  IPPOLITO explained that he had a contractor who would do the construction for $8,000, recommended a lawyer and guaranteed the approval from the Zoning Board of Appeals.

55.     In or about April of 2013, following the suggestion by IPPOLITO, Mr. Morizio asked the Plaintiffs whether he could construct such a permanent structure.  Inasmuch as the construction of a permanent structure would increase Plaintiffs' property taxes, Plaintiffs respectfully rejected Mr. Morizio's request, which was then conveyed to IPPOLITO.

56.     Upon information and belief, Mr. Morizio was informed that IPPOLITO had threatened that he would "shut down" Al Dente if he did not get his way.

57.     Upon information and belief, on July 26, 2013, Mr. Morizio was approached by a production company to film a television show for the Food Network, featuring Al Dente.

58.     The show would involve a renovation of Al Dente, at the production company's expense and would appear nationwide.

59.     Upon information and belief, after several meetings with producers, designers and contractors, the show's representatives desired to meet with IPPOLITO to expedite the necessary work permits and approvals.

60.     Upon information and belief, IPPOLITO refused to meet with the "Show's" representatives.

61.     Upon information and belief, on August 9, 2013, the owner of the production company informed Mr. Morizio that he needed approval from the TOWN to begin work on Al Dente, explaining that once they began construction and filming, they would be spending tens of thousands a day.

62.     Upon information and belief, after becoming frustrated with IPPOLITO's unreasonable lack of cooperation and being under pressure from the producers to obtain the necessary approvals, Mr. Morizio contacted the office of the TOWN Supervisor, John Venditto and spoke to the Supervisor's assistant.

63.     Upon information and belief, the Supervisor's assistant said she would assist Al Dente.

64.     Upon information and belief, on August 12, 2013, Mr. Morizio again contacted the Supervisor's office whereupon the Supervisor's assistant said that she spoke to the TOWN's Department of Planning and Development and urged them to do whatever is necessary to facilitate the television production.

65.     Upon information and belief, Mr. Morizio continued to receive pressure from the producers and demanded an answer concerning IPPOLITO's cooperation by the end of business, on August 12, 2013.

66.     Upon information and belief, Mr. Morizio then received an anonymous phone call, that IPPOLITO was angry that Mr. Morizio had gone over IPPOLITO's head by contacting Supervisor Venditto's office, and that IPPOLITO was planning to "close down" Al Dente.

**(1)     Defendants Issue False and Trumped Up TOWN Code Violations and Emergency Safeguard Notices to Plaintiffs and Al Dente**

67.     Therefore, upon information and belief, on August 13, 2013, IPPOLITO unlawfully dispatched BLANCHARD, CIAMBRA and CANGRO to Plaintiffs' premises and Al Dente to falsely write up Al Dente and the Plaintiffs, and to file with the TOWN Department of Planning and Development, a trumped-up and bogus "Emergency Safeguard Notification" as a false pretext to shutting down Al Dente.

12

68.     Upon information and belief, BLANCHARD asked Mr. Morizio, "you know what this is about, right?" When Mr. Morizio stated that he did not, BLANCHARD stated, "[IPPOLITO] is mad that you went over his head to Supervisor Venditto's office."

69.     Upon information and belief, BLANCHARD added, "[IPPOLITO] is the gun and I am the bullet." CANGRO snidely uttered, "maybe you should have sent [IPPOLITO] some meatballs," with CIAMBRA chiming in, "yeah, and those meatballs better be fresh!" and the men laughed.

70.     At that point Al Dente and the Plaintiffs were served with false and trumped-up violations akin to the ones that were dismissed just two months prior.

71.     These violations were returnable on September 16, 2013, which, as discussed below, was the date Plaintiffs' Premises as landlord for Al Dente were unlawfully padlocked without due process by the Conspiring Defendants before Plaintiffs or Al Dente were arraigned on the charges against them. There was no notice or hearing prior to the padlocking. None of the violations charged a violation of Article 96 of the TOWN Code, entitled "Dangerous Buildings." Yet, the Conspiring Defendants filed two bogus "Emergency Safeguard Notifications" and placed "Dangerous Building" notices on the windows of Plaintiffs' Premises.

72.     Evidencing the ludicrousness and spuriousness of the Conspiring Defendants' claims of a "Dangerous Building," there was a tenant who resided in the apartment above the restaurant within the same so-called "Dangerous Building" whom the Defendants allowed to remain.

13

73.     The fallacious and concocted "Emergency Safeguard Notifications, dated August 13, 2013 and September 11, 2013 were utilized by the Conspiring Defendants as the cornerstones in their plot to padlock Plaintiffs' Premises and shut down Plaintiffs' restaurant tenant.

74.     The fallacious and concocted August 13, 2013 "Emergency Safeguard Notification" alleged downright false and trumped-up defects in Plaintiffs' Premises which were completely disproved by the permits, approvals, authorizations and certificates of occupancy obtained by Plaintiffs' predecessors which were on file with and known to the TOWN and the Conspiring Defendants:

| Defendants' False Allegations | The Truth Based Upon TOWN Records |
|---|---|
| "Electric work not to code and exposed" | This was false. There were no exposed wires and the electrical installation was inspected and approved by the TOWN per Electrical Underwriters Approval Certificate Nos. N113595 and N251742 and per Certificates of Occupancy Nos. A21188 and A27651. The Conspiring Defendants suppressed the Certificates of Approval of the electrical installation. |
| "Remove old stack" | This was false and unnecessary. There was nothing dangerous about the stack. It is an inert and hollow galvanized steel tube venting fresh air into the restaurant. |
| "Exit doors must meet Egress Code" | This was false. The Egress doors were approved by the TOWN on plans approved on February 6, 1990 and August 13, 1992 and by Certificates of Occupancy Nos. A21188 and A27651. The exit doors, egress and emergency exit lights were inspected and approved by the Nassau County Fire Marshall as recently as April 30, 2013. |
| "Kneewall needs permit" | This was false. The Fence was approved by the TOWN on plans approved on February 6, 1990 and August 13, 1992 and by Certificates of Occupancy Nos. A21188 and A27651. |
| "Need UL for all electrical work" | This was false. The electrical installation was inspected and approved by the TOWN per Electrical Underwriters Approval Certificate Nos. N113595 and N251742 and per Certificates of Occupancy Nos. A21188 and A27651. The Conspiring |

14

|  | Defendants suppressed the Certificates of Approval of the electrical installation. |
| --- | --- |
| "Rear canopy with no permit needs flame spread rating" | This was false.  The canopy had a flame spread rating for the "life" of the canopy.  A permit application for the canopy had been submitted to the TOWN Department of Planning and Development in 2012, who sat on the application. |
| "Need fire door to boiler" | This was false.  The boiler room door was approved by the TOWN pursuant to Certificates of Occupancy, Nos. A21188, and A27651. The door to the boiler room is a metal fire door. |
| "Boiler room must be vented to code" | This was false.  The boiler room was vented to code and was approved by the TOWN pursuant to Certificate of Occupancy No. A21188. |
| "Must have emergency lights to code" | This was false.  On April 30, 2013, the emergency lights were tested and approved by the Nassau County Fire Marshall who is the ultimate authority on the subject. |
| "Special sprinkler must be in working order and valve open" | This was false.  The special sprinkler system in kitchen and dining room of Al Dente was in working order and the valve was open. |
| "Basement has prep kitchen with sinks.  Must file for all applicable permits for Certificates of Occupancy to be issued" | This was false.  The Conspiring Defendants suppressed the plan approved by the TOWN, dated August 13, 1992, which approved the "Basement Preparation Room" exactly as it existed on August 13, 2013.  The Conspiring Defendants have suppressed Certificate of Occupancy No. A27651 and Plumbing Approval Certificate No. G11180. |

75.     These deliberately and knowingly false charges against the Plaintiffs and Al Dente were overt acts in furtherance of the Conspiring Defendants' plot to demand arbitrary, unnecessary and unreasonable requirements in an effort to unlawfully shut Al Dente down to the utter detriment of the Plaintiffs.

76.     On August 23, 2013, CIAMBRA swore in a Criminal District Court information, that none of the above Certificates of Occupancy, plans or approvals existed for the Premises in the files maintained by the TOWN, which was totally false.  This falsely sworn information was

an overt act in furtherance of the Conspiring Defendants' plot to shut down Plaintiffs' tenant. CANGRO also submitted a similarly false sworn information.

77.     The unlawfully issued summonses were returnable on September 16, 2013. However, the Premises was padlocked by the Defendants without notice or a hearing, before Plaintiffs or Al Dente were even arraigned.

78.     On September 11, 2013, Defendants filed another false and concocted "Emergency Safeguard Notification" regarding the Premises.

79.     Akin to the one filed on August 13, 2013, the fallacious and concocted September 11, 2013 "Emergency Safeguard Notification" alleged downright false and trumped-up defects in Plaintiffs' Premises which were completely disproved by the permits, approvals, authorizations and certificates of occupancy obtained by Plaintiffs' predecessors which were on file with and known to the TOWN and the Conspiring Defendants:

| **Defendants' False Allegations** | **The Truth Based Upon TOWN Records** |
|---|---|
| "Unlawful tenancies/Certificates of Occupancy" | This was false. Plaintiffs possessed Certificates of Occupancy Nos. A21188 and A27651 and lawful tenants. |
| "Handicap Requirements must comply with Town Codes" | This was false. A single handicap bathroom was approved by the TOWN on plans dated February 6, 1990 and August 13, 1992 and by Certificates of Occupancy Nos. A21188 and A27651. The restaurants in the Hamlet of Oyster Bay do not have two fully accessible handicap bathrooms. |
| "Violations of NYS Health Department requirements" | This was false. The Nassau County Department of Health had ultimate jurisdiction over Al Dente which received an "A" rating (the highest rating) as recent as July 29, 2013. There were no critical violations of the New York State Health Department requirements. |

16

| | |
|---|---|
| "Dangerous electrical/plumbing" | This was false.  The electrical system was approved by electrical Certificates of Approval Nos. NBFY113595 and N1251742. The plumbing was approved by Certificates of Approval Nos. G11180, G6440 and G6530.  These approvals have been suppressed by the Conspiring Defendants as overt acts in furtherance of their conspiracy. |

        **(2)**      **Defendants Unlawfully Padlock Plaintiffs' Premises for One and a Half Years**

80.     On September 16, 2013, based solely on the Defendants' spite, malice and personal animus and under the totally false pretext that the Premises was in violation of TOWN code and the false and concocted filing of two Emergency Safeguard Notifications, as described above, CIAMBRA appeared at Al Dente and informed Mr. Morizio that IPPOLITO was shutting down the restaurant and the two entrances to the restaurant were padlocked by the Defendants.

81.     The Conspiring Defendants' unlawful actions of padlocking both entrances to the restaurant prevented Plaintiffs from entering, accessing or maintaining their own property. Without access to the restaurant, Plaintiffs had no access to the basement of the Premises.

82.     In addition, the Conspiring Defendants unlawfully shut off the gas and electricity to the restaurant and the basement with winter approaching.

83.     The padlocking and the termination of gas and electricity service unfathomably lasted from September 16, 2013 until January 2015.

84.     On December 13, 2013, Mr. Morizio sent a letter to the TOWN advising that CIAMBRA shut the gas valve at Al Dente and as such the restaurant did not have heat and the "specter of pipes freezing and bursting looms large." Mr. Morizio followed his letter up with an

17

email to the TOWN on January 9, 2014 stating that "there is a danger of the pipes freezing and bursting" due to the heat being intentionally and unlawfully shut off by the TOWN. The TOWN ignored these warnings.

85.     In addition, the Plaintiffs, specifically LEUNG, repeatedly called and emailed the TOWN, desperately requesting access to her own Premises in order to winterize and prevent damage to the Premises, following the unlawful padlocking and shutting off of the gas and electricity. Her desperate pleas were rejected and/or ignored by the TOWN.

86.     As expected, on or about January 29, 2014, the water in the pipes froze and the pipes burst, causing flooding and extreme damage to the first floor and basement of the restaurant within the Plaintiffs' Premises. The first floor toilets froze, burst and leaked down into the basement.

87.     Such damages to the Premises from the Defendants' unlawful and abhorrent acts include, but are not limited to: flooding/water damage, mold and mildew on the entire first floor and basement floors and ceilings; equipment, walk-in refrigerators and freezers destroyed; and the heat and hot water system rusted and destroyed. Plaintiffs had to replace the entire heating system and 2 sump pumps, the cost of which, along with the cost to remedy the other damage, exceeded $40,000.00.

88.     After the damage was done, the TOWN finally allowed LEUNG extremely limited access to the Premises, to have a plumber drain the restaurant and allow her insurance company to inspect the Premises, and then the TOWN quickly padlocked the doors once again.

18

89.     The insurance company ended up disclaiming coverage reasoning that the damage resulted from an *intentional* act, on the part of the TOWN.

90.     The actions of the Defendants, as described above, were so abrupt, repugnant and unlawfully undertaken without notice, that neither the Plaintiffs nor Mr. Morizio had any opportunity to remove any of the food contained within the walk-in boxes, which, due to the lack of electricity, spoiled and became rancid over the span of the one-and-a-half-year unlawful padlocking.  Due to the actions of the Defendants, the Premises became one giant biohazard between the combination of mold, mildew and rancid food.

91.     In January 2015, the middle of *another* winter with the Premises still padlocked and without heat or electricity, LEUNG, now at her complete wits-end, demanded a meeting with IPPOLITO.

92.     At this meeting, in which IPPOLITO was flanked by two attorneys and a secretary, LEUNG demanded access to her Premises, which had been padlocked and without heat or electricity for an unfathomable one-and-a-half years.

93.     IPPOLITO asked LEUNG, "is Al Dente still your tenant?"

94.     LEUNG replied, "No, the lease ended" inasmuch as Al Dente was forced out of business due to the actions of the Defendants, as described above.

95.     IPPOLITO responded, "OK, then I can release you" and the padlocks were removed that day.

19

96.     In early 2015, Plaintiffs made several attempts to re-lease the Premises to other restaurants and had a number of interested parties.  However, each time when the prospective tenant sought information and approvals from the TOWN, the TOWN would not allow it, leading one chef-owner to tell Plaintiffs, "I don't think you should lease this restaurant anymore- the TOWN isn't cooperating."

97.     Realizing there was no way the Defendants would ever let Plaintiffs be able to re-let the restaurant space, Plaintiffs placed the Premises on the market in or about March 2015.

98.     Market value for the Premises was approximately 1.2 million dollars.

99.     However, due to the extreme and unlawful actions of the Defendants as described above, including their false classification of the Premises as a "dangerous building" and their refusal to allow a new restaurant tenant, the Premises was less than desirable and sold for merely $740,000.00, considerably below market value.

100.    The Premises was purchased by Michael and Claudia Taglich.  Mrs. Taglich informed the Plaintiffs that her husband is friendly with IPPOLITO and will have no problem getting the necessary approvals to open a new restaurant, which was in fact opened without delay.

101.    Due to the unlawful and false violations issued to Plaintiffs by the Defendants and the unlawful padlocking of the Premises, Plaintiffs were unnecessarily forced to retain an attorney which cost over $10,000.00.

102.    Due to the unlawful actions undertaken by the Defendants with respect to Plaintiffs and Al Dente, the Plaintiffs' tenant went out of business and Plaintiffs lost out on monthly rent and additional rent in the amount of approximately $4,300.00 per month from April 2013.

103.    Due to the unlawful actions undertaken by the Defendants of falsely and unlawfully serving Plaintiffs with violations and classifying the Premises as a "dangerous building," Plaintiffs were forced to significantly reduce the rent below market value for the other tenants on the Premises (upstairs apartment and separate house) and when these tenants found out that Plaintiffs were forced to sell the Premises, they stopped paying rent altogether.

104.    Due to the unlawful actions undertaken by the Defendants, as described above, Plaintiffs were forced to sell the Premises for approximately $460,000.00 under market value.

**C.    Al Dente and Mr. Morizio Successfully Sue These Defendants in Federal Court**

105.    On February 26, 2014, Al Dente and Mr. Morizio commenced an action in the United States District Court, Eastern District of New York, 14-cv-1241 (LDW)(GRB), against these very same defendants for fundamentally the same constitutionally offensive conduct.

106.    On or about June 22, 2016, Al Dente and Mr. Morizio won a jury verdict in the amount of $650,001.00 in compensatory damages and $650,000.00 in punitive damages against IPPOLITO.[1]

---

[1] On July 7, 2016, Hon. Leonard D. Wexler overturned the awards and recommended an award of $450,000.00.

## MUNICIPAL LIABILITY AGAINST THE TOWN

107.    IPPOLITO, as the Commissioner of the Department of Planning and Development, is a Municipal Official with final decision-making and policy making authority to establish municipal policy who made an unlawful final decision to carry out the actions described herein.

108.    Upon information and belief, IPPOLITO and the TOWN Department of Planning and Development functioned autonomously.

109.    Upon information and belief, neither the TOWN Supervisor, nor the TOWN Board, exercise any supervision or control over IPPOLITO and/or the TOWN Department of Planning and Development.

110.    The TOWN has delegated to IPPOLITO final decision-making and policy making authority such that IPPOLITO's decisions and acts can be said to be the decisions and acts of the TOWN.

111.    IPPOLITO caused severe injury and damages to the Plaintiffs as described above.

112.    IPPOLITO's decision and policy making caused the deprivation of Plaintiffs' Federally protected rights, under color of law and without due process.

113.    The TOWN is responsible for the actions and decisions of IPPOLITO, as he possessed final policy making authority.

114.    The Conspiring Defendants' unconstitutional acts, as described herein, were caused by a policy or practice, established by the TOWN, to give IPPOLITO final decision and policy making authority.

22

115.    The jury in Al Dente and Mr. Morizio's action against these Defendants which alleges essentially the same unconstitutional conduct, has already determined that IPPOLITO was a final policy maker of the TOWN and that he directly committed or commanded the constitutional violations alleged.

## FIRST CLAIM FOR RELIEF

### PROCEDURAL DUE PROCESS – 42 U.S.C. §1983

116.    Plaintiffs repeat, reiterate and reallege each and every allegation contained in Paragraphs "1" through "115" inclusive, as if more fully set forth herein.

117.    At all times described herein, Plaintiffs possessed the clearly established property rights, under Federal, New York State, and Town Laws, to purchase, own and lease real property, the right to enjoy their property without unlawful deprivation of their use or enjoyment, to employ such properties in the manner of their choosing in accord with Federal, State and Town Laws without unlawful and arbitrary interference from the defendants.

118.    As fully set forth hereinabove, the Defendants, acting under color of state law, deliberately deprived the Plaintiffs of all of such property and liberty interests, without due process of law by, inter alia: (a) issuing two series of false, bogus and trumped-up violations and suppressing the appropriate plans, approvals, certificates of occupancy and other documents, in furtherance of their plot to shut down Plaintiffs' tenant; (b) falsely and unlawfully classifying Plaintiffs' Premises as a "dangerous building" in furtherance of their plot to shut down Plaintiffs'

23

tenant; and (c) unfathomably padlocking Plaintiffs property for one-and-a-half-years, without notice, hearing or an opportunity to be heard, and shutting off the gas/heat and electricity.

119.    The unlawful actions undertaken by Defendants, as described above, were driven solely by Defendants' spite, malice and personal animus towards Plaintiffs' tenant, and for no other legitimate, rational or lawful purpose.

120.    In effectuating such deprivations, while simultaneously engaging in calculated, deliberate and successful efforts to ensure that Plaintiffs were deprived of due process of law, the Defendants violated the Plaintiffs right to procedural due process as guaranteed under the Fourteenth Amendment of the United States Constitution; as such, each of the defendants are individually liable to the Plaintiffs pursuant to 42 U.S.C. § 1983.

121.    As set forth more fully hereinabove, the Defendants' actions unlawfully deprived the Plaintiffs of its property and liberty rights and interests in violation of procedural due process as guaranteed under the Fourteenth Amendment of the United States Constitution.

122.    As discussed herein above, each of the individually named Defendants herein acted in furtherance of their conspiracy, took an active part in, and/or ratified a consistent and systematic pattern of misconduct which was intentionally and maliciously intended by the Defendants to unlawfully interfere with and deprive Plaintiffs of their property rights, in willful violation of the Plaintiffs' U.S. Constitutional rights.

123.    Having substantially interfered with and/or deprived the Plaintiffs of their liberty and property interests without having afforded the Plaintiffs any opportunity at a meaningful time and meaningful manner within which to review or challenge the Defendants' concerted behavior, the Defendants violated the Plaintiffs' right to procedural due process as guaranteed to the Plaintiffs under the Fourteenth Amendment of the U.S. Constitution.

124.    As a result of the aforesaid Defendants' violation of Plaintiffs' procedural due process rights, the Plaintiffs have been damaged by being unable to use the property in a manner by which they were permitted to do as a matter of law and right, and by the loss of income and profits from being unable to use, derive a benefit from, and/or profit from the use of the land and the property damage and associated costs and fees resulting from the Defendants' unlawful, abhorrent and constitutionally offensive behavior.

125.    All of the injuries described herein above were actually and proximately caused by the concerted acts of the Defendants described herein.

126.    The aforesaid Defendants' violations of Plaintiffs' due process rights were made under color of state law, which constitutes "state action" under 42 U.S.C. § 1983.

127.    Having deliberately violated the Plaintiffs Constitutionally protected rights, and concomitantly having caused the Plaintiffs to sustain monetary damages as a result thereof each of the Defendants are personally liable to the Plaintiffs, and the Plaintiffs are entitled to secure relief against the Defendants, pursuant to 42 U.S.C. §1983.

128.    The actions of the Defendants were performed with actual spite, malice, and an affirmative intent to injure the Plaintiffs, and were calculated efforts which the Defendants undertook with actual knowledge that their actions were in actual and deliberate violation of the Plaintiffs' U.S. Constitutional rights.

129.    In view of the forgoing, Plaintiffs are entitled to recover compensatory damages in the amount of one million dollars ($1,000,000.00) and punitive damages in the amount of five million dollars ($5,000,000.00), together with costs, attorneys' fees and expert fees.

### SECOND CLAIM FOR RELIEF

### SUBSTANTIVE DUE PROCESS – 42 U.S.C. §1983

130.    Plaintiffs repeat, reiterate and reallege each and every allegation contained in Paragraphs "1" through "129" inclusive, as if more fully set forth herein.

131.    At all times described herein, the Plaintiffs were vested of constitutionally protected property rights and liberty interests, as set forth herein above.

132.    As detailed herein above, the Defendants arbitrarily, capriciously and deliberately deprived the Plaintiffs of such property rights and liberty interests, and engaged in a pattern of insidious, spiteful and malicious conduct which was oppressive in a constitutional sense and would serve to "shock the judicial conscience," in violation of the Plaintiffs rights to substantive due process, as guaranteed to the Plaintiffs under the Fourteenth Amendment to the United States Constitution.

26

133.    As a result of the aforesaid Defendants' violation of Plaintiffs' substantive due process rights, the Plaintiffs have been damaged by being unable to use the property in a manner by which they were permitted to do as a matter of law and right, and by the loss of income and profits from being unable to use, derive a benefit from, and/or profit from the use of the land and the property damage and associated costs and fees resulting from the Defendants' unlawful, abhorrent and constitutionally offensive behavior.

134.    All of the injuries described herein above were actually and proximately caused by the concerted acts of the Defendants described herein.

135.    The aforesaid Defendants' violations of Plaintiffs' due process rights were made under color of state law, which constitutes "state action" under 42 U.S.C. § 1983.

136.    Having deliberately violated the Plaintiffs Constitutionally protected rights, and concomitantly having caused the Plaintiffs to sustain monetary damages as a result thereof each of the Defendants are personally liable to the Plaintiffs, and the Plaintiffs are entitled to secure relief against the Defendants, pursuant to 42 U.S.C. §1983.

137.    The actions of the Defendants were performed with actual spite, malice, and an affirmative intent to injure the Plaintiffs, and were calculated efforts which the Defendants undertook with actual knowledge that their actions were in actual and deliberate violation of the Plaintiffs' U.S. Constitutional rights.

138.    The Defendants' concerted unlawful actions, as described hereinabove, will serve to "shock the judicial conscience."

27

139.    In view of the forgoing, Plaintiffs are entitled to recover compensatory damages in the amount of one million dollars ($1,000,000.00) and punitive damages in the amount of five million dollars ($5,000,000.00), together with costs, attorneys' fees and expert fees.

### THIRD CLAIM FOR RELIEF

**DEFENDANTS' CONSPIRACY TO VIOLATE THE PLAINTIFFS' CIVIL RIGHTS**
**42 U.S.C. §1983**

140.    Plaintiffs repeat, reiterate and reallege each and every allegation contained in Paragraphs "1" through "139" inclusive, as if more fully set forth herein.

141.    Each and all of the Defendants conspired with and among each other in order to violate the Plaintiffs' constitutionally protected rights to procedural and substantive due process, as described hereinabove.

142.    Acting under the direction of, and in conspiracy with, Defendants IPPOLITO, CIAMBRA, BLANCHARD and CANGRO conspired with the others to unlawfully deprive the Plaintiffs, either directly or indirectly, of their property and liberty rights under the due process clause as guaranteed under the Fourteenth Amendment of the United States Constitution.

143.    In furtherance of the conspiracy, as described herein above, the Defendants engaged in a consistent and systematic pattern of misconduct which was intentionally and maliciously intended by the Defendants to unlawfully interfere with and deprive Plaintiffs of their property rights in an effort to shut down the Plaintiffs' restaurant tenant.

144.    The aforesaid Defendants' conspiracy to violate Plaintiffs' constitutional rights was made under color of state law, which constitutes "state action" under 42 U.S.C. §1983.

145.    In carrying out their conspiracy against the Plaintiffs, the Defendants engaged in conduct which was performed with actual spite, malice, and an affirmative intent to injure the Plaintiffs, and were calculated efforts which the Defendants undertook with actual knowledge that their actions were in actual and deliberate violation of the Plaintiffs' U.S. Constitutional rights.

146.    In view of the forgoing, Plaintiffs are entitled to recover compensatory damages in the amount of one million dollars ($1,000,000.00) and punitive damages in the amount of five million dollars ($5,000,000.00), together with costs, attorneys' fees and expert fees.

**WHEREFORE,** Plaintiffs respectfully request the following relief:

   a.  On the First Cause of Action, for compensatory damages in the amount of one million dollars ($1,000,000.00) and punitive damages in the amount of five million dollars ($5,000,000.00), together with costs and attorneys' fees (pursuant to 42 U.S.C. §1988(b)) and expert fees (pursuant to 42 U.S.C. §1988(c));

   b.  On the Second Cause of Action, for compensatory damages in the amount of one million dollars ($1,000,000.00) and punitive damages in the amount of five million dollars ($5,000,000.00), together with costs and attorneys' fees (pursuant to 42 U.S.C. §1988(b)) and expert fees (pursuant to 42 U.S.C. §1988(c));

   c.  On the Third Cause of Action, for compensatory damages in the amount of one million dollars ($1,000,000.00) and punitive damages in the amount of five million dollars ($5,000,000.00), together with costs and attorneys' fees (pursuant to 42 U.S.C. §1988(b)) and expert fees (pursuant to 42 U.S.C. §1988(c)); and

   d.  Such other and further relief as to this Court may appear just and appropriate.

Dated: Merrick, New York
August 3, 2016

CAMPANELLI & ASSOCIATES, P.C.

By: _____s/_____
ANDREW J. CAMPANELLI (AC4014)
1757 Merrick Avenue, Suite 204
Merrick, New York 11566
T: (516) 746-1600
F: (516) 746-2611
ajc@campanellipc.com
*Attorneys for Plaintiffs*

- and –

LAW OFFICES OF
DAVID A. ANTWORK, P.C.

By: _____s/_____
DAVID A. ANTWORK (DA1168)
1757 Merrick Avenue, Suite 205
Merrick, New York 11566
T: (631) 879-7456
F: (516) 746-2611
dantwork@davidantworklaw.com
*Attorneys for Plaintiff*

## VERIFICATION

STATE OF NEW YORK    )
                         ) ss.:
COUNTY OF _Queens_   )

SANDRA LEUNG, being duly sworn, deposes and says:

I am a Plaintiff in the within action and have read the foregoing **COMPLAINT** and know

the contents thereof.  The same is true to my own knowledge, except as to those matters said to be

upon information and belief, and as to those matters, I believe them to be true.

Sworn to before me on this
_3_ day of August, 2016

SIU CHEI CHEUNG
Notary Public, State of New York
No. 01CH6202262
Qualified in Queens County
Commission Expires March 16, 2019

_____
SANDRA LEUNG